JOHN DOE, Lessee of MATTHEW KEAN *vs.* RICHARD ROE, Casual ejector, and JOSEPH HOFFECKER, tenant in possession.

The interest of devisee over in an executory devise will pass by will, or *descend* upon the death of such devisee *before* the contingency happens. And upon the happening of such contingency, the estate goes to the heir of the person last entitled, without regard to the blood of the first devisee over: contrary in this respect to the English rule.

In this state *seisin* is not necessary to make a stock of descent. Title, or any manner of *right* legal or equitable, is sufficient.

In construing wills, technical words are to be taken in their technical sense unless a *plain* intention appear to the contrary.

Whenever the devise is to children and grand-children, or to brothers and sisters and nephews and.nieces, to be equally divided between them, and the devisees are *individually named*, they take *per capita* and not *per stirpes.*

The words *equally to be divided*, when used in a will, mean a division *per capita*, and not *per stirpes*, whether the devisees be children and grand-children, brothers or sisters and nephews and nieces, or strangers in blood to the testator.

EJECTMENT.

Statement of facts agreed on filed, and on the application of counsel on both sides, ordered that the questions of law arising on the case stated be reserved, and that the same be heard in the Court of Errors and Appeals; the judgment of the Superior Court to await the decision of the said Court of Errors and Appeals on the said questions of law.

The case stated presented the following facts:

It is agreed by the parties to this cause, on both sides, to wit: the plaintiff in his proper person, and the defendant, by Robert Frame, Esq., his attorney, to submit the same to the decision and judgment of the said Superior Court, upon the following facts and case stated for the purpose, viz:

Thomas J. Macomb, late of New Castle county, now deceased, in his life time being seised in his demesne as of fee, of the lands and premises in the declaration mentioned, that is to say, of a certain plantation or parcel of land, with the appurtenances, situate in Little Creek hundred, Kent county and State of Delaware, now in the possession and tenure of the said 'Joseph Hoffecker—a part whereof consisting of woodland and detached from the rest, is located in the white-oak swamp, and containing in the whole about four hundred acres, made, executed and published his last will and testament, in due form required by the law for the devising of real estate, bearing date the 23d February, A. D. 1813, and therein and thereby devised the said lands and premises as follows, to wit: " *First.* My will is that all my personal property of every description whatsoever be

sold, and its proceeds applied, as far as they may go, to the payment of my debts; and in case it be insufficient, then I direct that the rents and profits of my real estate, excepting the annuity hereinafter bequeathed to my sister Elizabeth, be annually applied to the payment of my said debts.   And as it respects my real estate, I dispose of it in manner following.   *Imprimis*: The sum of three hundred dollars of the rents and profits thereof, I give and bequeath to my sister Elizabeth Macomb, to be paid to her annually from the time of my death until all my debts are paid, and no longer; and the remainder of the said rents and profits, I direct may be applied to the payment of my debts annually, until they be satisfied.   Consideration and circumstances of all parties, this disposition of my estate in relation to the payment of my debts, appears to me the best I can make, and I enjoin it upon my executor hereinafter named, to arrange it, if possible, with my creditors.   But in case he fail in doing so, then my will is that such a portion of my real estate as may be absolutely necessary, be sold for the payment of my debts.   And after all my debts are paid, either by the application of the annual rents and profits, or by a sale of a part of my real estate, I give and devise my said real estate, consisting of a farm in Little Creek neck, Kent county, and State of Delaware, and all the other real estate whatsoever, to which I may be entitled, to my sister Elizabeth Macomb, to my brother James B. Macomb, and to my nephews and nieces, Joshua Clayton, Elizabeth Clayton, Jennet Clayton and Henry Clayton, children of my late sister Jennet Clayton, in the proportions and manner, and under the restrictions following, that is to say : I give and devise one-third part of all my said real estate to my sister Elizabeth Macomb, and her heirs and assigns forever ; and one-half of my said real estate, composed in part of the said one-third, I give and devise to my said sister Elizabeth during her life ; but in case she should marry in the life time of her brother, James B. Macomb, or in the life time of his issue, if he shall have left any, then her life estate is to determine, and the interest constituting the same, to wit : the difference between one-third and one-half of the said real estate, I devise equally to my said brother James B. Macomb, and to my said nephews and nieces, as is hereinafter directed.   And in case my said brother James should be dead and have left no issue, who shall be living at the time of Elizabeth's marriage, then her life estate is not to cease, but she is to enjoy the interest thereof as is hereinafter directed.

 " *Item.*   I give and devise one-fourth part of my said real estate ; and, in case my sister Elizabeth should marry, or die in the lifetime of my brother James, or of his issue, if he have left any, one-third part of my said real estate, to my said brother James B. Macomb, in

fee simple, if he shall leave any child living at the time of his death; but if he dies and leaves no child in life at his death, then his interest in the said fourth or one-third part, as the case may be, is to be considered only as a life estate, and upon his death to determine and go over as an executory devise in manner following, that is to say: if his said interest consists only of the one-fourth part, *then the whole thereof to my said nephews and nieces, and their heirs and assigns;* but if it shall consist of the one-third part, then the said third part *to be equally divided between my sister Elizabeth and my said nephews and nieces, their heirs and assigns forever, as tenants in common, and not as joint tenants.*"

" *Item.*—I give and devise one-fourth part of my said real estate, and, upon the death of my said sister Elizabeth, or upon her marriage in the event referred to in the devise to her, one-third part of my said real estate to my nephews and nieces, Joshua Clayton, Elizabeth Clayton, Jennet Clayton, and Henry Clayton, their heirs and assigns forever, as tenants in common, and not as joint tenants. But in case all my said nephews and nieces should die under twenty-one years of age, and without lawful issue living at the time of the death of the longest liver, then I give and devise all the share of my said nephews and nieces to their father, Thomas Clayton, Esquire, his heirs and assigns forever."

" *Item.*—It is my will that the devises hereinbefore given to my said sister Elizabeth, and to my said nephews and nieces, are to be in lieu of the principal and interest (if any) of certain legacies bequeathed to my sister Jennet, mother of my said nephews and nieces, and to my said sister Elizabeth, by the will of my grandfather Thomas Irons, and in case my sister Elizabeth or my said nephews and nieces, or any person for them, or in their right, shall claim the said legacies, or any part thereof, then the devise so given shall cease and determine as to the person so claiming, and be equally divided *in fee simple* between the devisees herein named, who shall not claim the aforesaid legacies." (Prout the said will.) That the said testator, the said Thomas J. Macomb afterwards, to wit: on or about the 31st March, A. D. 1813, departed this life, being at the time of his death still seised as aforesaid, of the said lands and premises, and leaving his said will in full force; which was afterwards, on the day and year last aforesaid duly proved, approved and allowed by and before the register for the probate of wills, &c., in and for New Castle county aforesaid. The said testator left to survive him his said brother and sister, and nephews and nieces, the devisees aforesaid, in his said will named, who were likewise his only heirs at law; the

said nephews and nieces being the children of a deceased sister of the testator, who had died previous to the making of his said will, and who was the wife of the aforesaid Thomas Clayton, Esq., who survived her and is still alive.

The testator's debts were all paid off by his executor, soon after his decease, and without resorting to his said real estate for that purpose.

The testator's said sister Elizabeth, intermarried with the said Matthew Kean, the lessor of the plaintiff, in the life time of her brother, the aforesaid James B. Macomb, and had issue by him the said Matthew Kean, two children, viz: Thomas Kean and James Macomb Kean, and then departed this life in the month of January, A. D. 1818, and left to survive her, her said brother James B. Macomb, and also her said husband and children, her said two children being her only heirs at law. The said Thomas Kean and James Macomb Kean both died in or about the month of August, A. D. 1831, both being intestate, under age and without issue. The said James B. Macomb died on the 21st day of December, A. D. 1832, intestate and without issue. He left to survive him the lessor of the plaintiff, and also the said Joshua, Elizabeth and Jennet Clayton, but the said Henry Clayton had died previously under age and without issue; the said Joshua, Elizabeth, Jennet and Henry Clayton, being the nephews and nieces of the said James B. Macomb and Elizabeth Macomb, by their mother's side.

The said Matthew Kean and Elizabeth his wife, in her life time, by their deed of bargain and sale, duly executed, acknowledged and recorded, and bearing date the 25th of September, 1817, (prout the same,) sold and conveyed unto Thomas Clayton, Esq., and his heirs and assigns forever, the aforesaid third part of the aforesaid lands and real estate, which was devised to her the said Elizabeth in fee simple, *in possession*, in and by the said will of her said brother, Thomas J. Macomb; but in and by said deed they expressly reserved and excepted the interest which she, the said Elizabeth, took under the said will, by way of *executory devise*, in the aforesaid one-third part of the said lands and real estate, of which the said James B. Macomb became and was so seised and entitled as aforesaid.

And it is further agreed that the will of Thomas Irons, the grandfather of the testator, which is referred to in his last will and testament hereinbefore recited, shall be admitted as a part of this case stated, subject, however, to any question of its admissibility as evidence to explain the said will of the said Thomas J. Macomb.

On the foregoing statement of facts, the question submitted for the decision of the court is, whether the lessor of the plaintiff, upon

the death of the said James B Macomb, became entitled to any and what interest in the premises devised as aforesaid by the last will and testament of the said Thomas J. Macomb, If the court are of opinion that he has a title to any undivided share or part of the premises devised by the said will of the said Thomas J. Macomb, bevond what was conveyed as aforesaid by the deed of himself and wife to Thomas Clayton, Esq., then judgment to be rendered for the plaintiff for such share or part. But if the court should be of opinion that he has no title to any share or part of the said premises, then judgment to be rendered for the defendant.

*J. A. Bayard,* for plaintiff:

1st question. Whether the will of Thomas Irons, the grandfather, is admissible in evidence to aid in the construction of the will of Thomas J. Macomb. The latter refers to the former; and wherever a paper is referred to in a will, it is always admissible to show intention. Extraneous circumstances, family connections, ages and conditions in life, may be resorted to for the same purpose. 4 *Russel,* 526, *Pyecroft* vs. *Gregory;* and *Lowe* vs. *Lord Huntingtower,* in a note to that case. 6 *Term Rep.* 810; 8 *Ibid.* 147.

2d question. What portion did Elizabeth Macomb (afterwards Mrs. Kean) take, under the said will, of the one-third part devised over by way of executory devise upon the death of James B. Macomb without issue? I admit that, by the words of the clause, "to be equally divided between my sister Elizabeth and my said nephews and nieces, their heirs and assigns forever," the construction of law would be as the defendant claims, a division *per capita;* but the intention is sufficiently apparent on the whole will to give one-half to the sister, and the other half to the nephews and nieces, regarding them as the representatives of the other sister. The land is in the first place given to the brother, sister and children of another sister, being divided into three parts, and given, one-half to Elizabeth, (to wit. a third in fee and half of a third for life,) one-fourth to James B. Macomb, and one-fourth to the testator's four nephews and nieces, regarding them as a *stock.* There is some perplexity in the subsequent provisions of the will, intended to meet a change of circumstances; but the general intention is obviously preserved of classing the objects of his bounty, and regarding the nephews and nieces, being the children of a deceased sister, as one class. Thus, in the event of his sister Elizabeth marrying, he divides the land thus: one-third to Elizabeth, (taking away her life estate in the half of a third,) one-third to his brother, and one-third to his nephews and nieces. He then provides for another event, the death of James B. Macomb without issue. In that case he disposes of his share by reference to

the interest he might have taken, and this depended upon whether Elizabeth had married or not.    Thus, if she had not married, James B. Macomb's interest would have been but *one-fourth*, and he gives that fourth, one-half to Elizabeth and one-half to the four nephews and nieces.    But if Macomb's interest was a *third*, that is if Elizabeth had married, which is the case before us, he then gives that third " to be equally divided between his sister Elizabeth and his said nephews and nieces."    Now, our construction will still keep up the same equality of division in the estate, and give *one-half* to Elizabeth, to wit: one-third originally and a half-third of this executory devise, and the same to the nephews and nieces; but their construction destroys the equality by giving to Elizabeth only a third and a fifth of a third, while it gives to the four nephews and nieces, a *third and four-fifths of a third.*

And our construction derives strength from the fact that the devise is in lieu of legacies bequeathed to Elizabeth and Jennet Macomb, by the will of their grandfather, Thomas Irons, which legacies were equal, and the equality ought to be carried out.

The lessor of the plaintiff is, therefore, entitled to one-half of this third devised to James B. Macomb, as the representative of his wife Elizabeth the devisee over, or rather as the heir at law of his children by her.

*Frame*, for defendant:

It is a dry case of construction of a will; whether Matthew Kean, as the representative of his wife Elizabeth Macomb, is entitled to one-half of one-third of the estate, or to one-fifth of one-third, sharing it equally with the nephews and nieces of the testator.    The latter is my construction.    It is admitted that the legal construction of the words of the will is against them.    10 *Vezey*, 166, 176, 177; 3 *Bro. Cha. Ca.* 64, 69, 367; 8 *Vezey*, 604, 607; 2 *Peere. Wms.* 384; and I admit, with equal frankness, that if a different intention *plainly* appear on the will, it will control the legal construction, and the point i3 against us: but this must not be a mere supposition or argumentative intention, but a plain intention manifested on the will.

The testator gave to Elizabeth an annuity of three hundred dollars until the payment of certain debts; and then devised the farm to Elizabeth, who was his sister, to James B. Macomb, his brother, and to Joshua, Elizabeth, Jennet and Henry Clayton, his nephews and nieces.    And in case of the death of James B. Macomb, without issue, he devised his share over by way of executory devise, if a *fourth*, then all of it to his said nephews and nieces; if a *third*, as it turned out to be, then to his sister and his said nephews and nieces, equally to be divided between them.    The one-*half* of the estate was given

to Elizabeth, on the condition that she should not marry : at once a fee in one-third, and a life estate in the half of a third, to be enlarged into a fee if she should not marry.   Now the construction claimed by the other side, makes it the same thing, whether she marries or not.   This must be against the intention of the testator.   If Macomb had but one-fourth, Elizabeth had a half by complying with the condition ; if he took one-third, and she was entitled to half of this after his death, she would still get one-half of the whole estate, whether she married or not.

As to the admissibility of the will of Thomas Irons to aid in the construction, I have not considered its effect as of sufficient consequence to require of me an examination of the question.   The legacy given by it was not to the nephews and nieces of Thomas J. Macomb, but to their mother.   They took nothing under the will of Thomas Irons ; and their interest under the will of Thomas J. Macomb, cannot be affected by any idea of carrying out or executing the will of Irons.

*Bayard,* in reply :

The radical defect of the argument on the other side is in regarding the words of this devise as having any thing technical in them. They derive force only as indicating intention ; they may be rejected, transposed, construed in any way to effect the intention.

The meaning of the testator was, to give Elizabeth some provision more than her brother, or the children of his other sister unless she married : and if she married, she would have no necessity for any greater provision than the others.   Throughout, he regards these nephews and nieces *per stirpes,* as the representatives of their mother, without any intention of raising them each on an equality with their aunt, and dividing with her *per capita.*

[After the argument of the cause a doubt arose as to the right of Matthew Kean to inherit from his children this executory devise, which did not fall in either during the life time of their mother, the devisee over, or during their lives ; and, on the application of both sides, the court directed a re-argument of the case in reference to this question.]

*Frame.*—The case having been argued as to what share Matthew Kean was entitled to, supposing he was certainly entitled to some interest, we now controvert his right to any portion of the estate.   The devise over, after the death of James B. Macomb, was an executory devise.   That is admitted.   Mrs. Kean took a portion of it ; she died before the contingency happened, to wit: the death of J. B. Macomb; but she left children who also died before the contingency happened. Under our intestate law the father, M. Kean, is the heir to his chil-

dren; but this executory devise never having vested either in the mother or children so as to make them the root of inheritance, according to the English rule, the party to take must be of the blood of the first remainderman. However many intermediate heirs there might have been, provided the contingency did not happen while they lived, no interest vested in them; and when it fell, the party entitled must be the heir of the first person to whom it was limited, to wit: of Mrs. Kean. Now the husband is not the heir to his wife; but her nephews and nieces.

This is the undoubted English rule, and the only question will be, whether it is altered by our intestate law. 2 *Woodeson*, 237; 7 *Cranch*, 456, 69, 70; 2 *Wils.* 29; 5 *Bos. & Pul.* 383. The intestate law (*Digest*, 315) is very broad I admit. But I contend that at the dying of Kean's children, they were not entitled to any estate legal or equitable—merely a possibility of estate; they had no manner of right of which they died intestate. It is necessary to recur to the principles of the common law in order to ascertain the qualities of estates, by which test it is apparent that this executory devise, though it fell to Mrs. Kean's heirs, and their heirs from heir to heir, until the executory devise took effect, yet in the course of this descent none of the descending heirs had any manner of estate in it, and when it fell it necessarily fell to the heir of Mrs. Kean, and not of the intermediate heirs.

The old intestate law, (1 *Del. Laws*, 288,) which was in force at the time Mrs. Kean died. governs this case. The expression there used is, "If any person, being the *owner*" of land, shall die, it shall descend, &c. &c. No question that she had such a right as might be transmitted to her heirs, might even be effected by her acts during her life time. She might bar it by fine and recovery, or other acts which would operate as an estoppel; but not so of these heirs, if they may be called such, before the contingency happened. They could in no manner bind or effect this interest. They were in no respect the "owners" of this executory devise, nor had any interest which could descend under either of these intestate laws.

*J. A. Bayard.*—On the question heretofore argued, I shall say but little, except that in the construction of wills cases can have but little application, because the construction of every will must depend on the intention of the testator as apparent on the face of the whole will.

2d. As to the other question, it seems to me to be an over refinement. My answer to it is, that the object and intention of our legislature were to alter the whole course of descent as it exists in England. You are not to look in any case to the common law for the

course of descent here; it is all regulated by our intestate law, which cuts up the whole system of English descent by the roots—all the doctrine of primo-geniture, tracing of blood, and all other refinements of the common law.

At the death of Mrs. Kean, her interest in this executory devise went to her children, not by the common law, for that would take it to the eldest alone, but to all the children under our intestate law; it was a hereditament, an interest capable of descending. This right of descent cannot be confined to estates capable at the time of being taken or divided, for this would exclude equally a vested remainder, which it was never doubted could descend during the life estate on which it depended. This interest then was capable of descending to the children; and whatever interest Mrs. Kean had in it, descended to them. The law which cuts off the English course of descent to the eldest son, equally cuts off all these refinements, some of them ridiculous, and one of which is the principle contended for, that of reverting at the happening of the contingency to the first devisee as the root. Our law gave all her interest to her children, and to their children or heirs. The present intestate law regulates the descent. "When any person dies, having *title* or any manner of *right*, legal or equitable, to land," &c., it shall descend to their *heirs.* The children of Mrs. Kean had a *right* in the executory devise, viz: the right of their mother, and on their death this right descended to their heir, their father, the lessor of the plaintiff.

It cannot be questioned that the legislature have power to control the descent of property. And their intention was to eradicate all these principles of descent of the common law, many of which outrage the feelings of humanity; as in this very case, to regard the father as a stranger in blood to his children, and give their estate over to distant relatives, because they are of the blood of their mother from whom the estate came.

*Frame.*—I did not intend to go into the first question again on this argument, but Mr. Bayard having touched upon it, I desire to add a few words.

Having a most conclusive opinion on that branch of the case, I do not mean that the hesitation I have expressed as to the last question, should be understood as going any further. I deny that the will of Thomas Irons is admissible in the examination of this question, though I do not consider it of sufficient consequence to oppose it strenuously. How can the equality of legacy in that will control in any manner the devises of Thomas J. Macomb, or in any way show an intention of continuing this equality. Why, he violates the equality in the

very beginning, by giving an annuity of $300 to Elizabeth. It shows the loose conjectures to which we resort in looking for intention, and the policy of restricting constructions by some fixed rules of law. Those rules establish that the terms used here, mean an equal division per capita, and not per stirpes. No intention contrary to this can be collected from this will, unless it is made up of such loose conjecture as ought not in any case, to control the legal force of words and the fixed principles of law as applicable to devises.

The opinion of the court was delivered by Mr. Justice Black.

BLACK, *Justice:*

Upon the facts set forth in the case stated, two questions are presented for decision. The first is—How in this state do executory devises pass when the devisee over dies intestate, before the contingency happens, on which the devise over is to vest or be enjoyed? Is the inheritance transmitted according to the rules of the common law, or does it pass according to the course prescribed by the act of assembly of this state regulating the descent of the real estates of intestates. If the former be the rule by which we are governed, the lessee of Matthew Kean cannot recover any part of the land in question, because Matthew Kean is not of the blood of the devisee over, nor the heir of that devisee at the time the contingency happened on which the estate was to vest.

It is admitted that with regard to the one-third of the real estate, devised to J. B. Macomb, the limitation over by way of executory devise, to the sister and nephews and nieces of the testator, in the event of J. B. Macomb dying without leaving a child living at the time of his death, is a good executory devise. The sister, Elizabeth, married the lessor of the plaintiff M. Kean; she died intestate in the life time of her brother James, leaving two sons, who both died under age intestate, and without issue during the life time of their uncle James; James B. Macomb afterwards died, never having married.

Contingent as well as vested interests in either real or personal estate, and also executory devises, and all possibilities coupled with an interest, where the person to take is certain, may be assigned or devised, and are transmissible to the representatives of the devisee, if he dies before the contingency happens: and when the contingency does happen, they vest in the representative of the real or personal estate as the case may be. It is otherwise, if the object of the limitation over is not ascertained or fixed; or the persons to whom the estate is to pass are not ascertainable until the contingency does happen; as in the case of a limitation to the right heirs of a person living; for during the life of such person, it cannot be known who his

heirs will be, nor in whom the interest is. These principles will be found fully established by the following authorities. 4 *Burns' Ecc. Law.* 139; 2 *Wilson*, 29; 3 *Term*, 93-4; 1 *Vezey*, 47, 237; 2 *Saund.* 388, *note h.*; 1 *Hy. Blac.* 30; *Talbot*, 117; *Willes*, 211; 1 *P. Wms.* 564; 1 *Fearne on Remr.* 534, 536, 540; 2 *Fearne* 530, *et. seq.*; 4 *Kent's Com.* 284, 510.

The English rules or canons of inheritance, are of feudal growth, and in their most essential features have not found favor either in this state, or in our sister states: they have been very generally rejected, and each state has adopted its own rules regulating the descent of real estate, which in the main will be found to be the converse of those which have obtained in England. Primo-geniture among the males—the preference of males to females—the exclusion of the lineal ascent of the inheritance—the entire exclusion of the half-blood—have been deemed in this state unreasonable, unnatural and harsh principles, inconsistent with the character and policy of our government, and not calculated to promote the true interests of its citizens.

The system of descent, established by statute in this state as to the real estates of intestates is as follows:—When any person having title, *or any manner of right, legal or equitable,* to any lands, tenements or hereditaments, dies intestate as to the same, such lands, *descend* and *pass* in fee simple—1st., to the children of the intestate and the lawful issue of any such child or children who may have died before the intestate: but if there be no such child or children, or issue of such child or children; then 2ndly., to the brothers and sisters of the intestate of the *whole blood,* and to the issue of such deceased brothers or sisters who may have died before the decease of the intestate: but if there be none such: then 3rdly., in like manner to the brothers and sisters and issue of such of the *half-blood:* but if there be none such: then 4thly., to the father of the intestate; or, if there be no father, then, 5thly., to the mother of the intestate; and if there be no mother, then 6thly, to the next of kin of the intestate, and to the lawful issue of such next of kin, who shall have died before the intestate. This is the course, not only where there is a fee simple title, but where there is any manner of right.

Such is our system of descent; one essentially different in every important point from that which the peculiar policy of England has established in that country. We give no preference to males over females, no preference to the eldest son. We do not exclude the half-blood from inheriting, if there be no heir of the whole blood. We do not prohibit the lineal ascent of the inheritance, but expressly ordain that the father shall inherit the land of the son, if he leaves

neither issue, nor brothers, nor sisters, nor any issue of them. There is nothing in our act limiting the inheritance, when it passes collaterally or ascendingly to those who may be of the blood of the first purchaser. It does not require us, in ascertaining who is *heir*, to search for the first purchaser, and trace his blood to the claimant. It classes the persons who are to inherit in succession, and requires that they shall have a certain connection or relation to the intestate, but does not require him to connect himself by blood or otherwise with any one beyond the intestate, or with the first purchaser, from whom the estate descended to the intestate, except where the estate passes to brothers and sisters under that act. In that case the brothers and sisters of the intestate, who are of the blood of the ancestor or of the parent from whom the lands came, to the intestate by devise or descent, are preferred, if the lands were thus acquired. If they were acquired otherwise, they pass in the manner before stated.

Such being the state of our law as established by statute, can we hold, as is done in England, that no one shall inherit lands as heir, unless he be of the blood of the first purchaser; or that he who claims a fee simple by descent from one who was first purchaser of the reversion or remainder, expectant on a freehold estate, must be of the same blood, and make himself heir to such purchaser at the time the remainder or reversion falls into possession? To do so would, in our judgment, directly contravene our statute regulating descents. By it the father is made the heir of his child, whenever the child dies without issue, and brothers and sisters or their descendants, without requiring any connection by blood with the person from whom the child derived the estate—he inherits in such case all his estate; he is made by the act of assembly his only heir, and takes every interest of his son however acquired. Suppose one dies, and his estate descends to his grandchild, the mother of the child, who was the daughter of the grandfather, being dead; the grandchild dies, leaving its father to survive—can any doubt exist that, under our laws, the estate would pass to the father of the child, although he has not in him any of the blood of the grandfather, who was the purchaser of the land? So, too, if the estate came to the child from a maternal aunt who had purchased it, the father would inherit it, though not of the blood of the aunt who was the purchaser. The general object of the intestate law in this state is, to continue the estate in the family of the *intestate*, without regard to the families or connections of those from whom it may have descended to the intestate, and it therefore looks principally to the paramount claim of proximity of blood to the intestate. The single exception is the one we have noted.

In England, *seisin* is necessary to make the stock of descent, but not so in this state. With us, title or any manner of right, legal or equitable, is sufficient. Executory devises are not considered as bare possibilities, but as certain interests and estates, and they vest or so far vest before the contingency happens, as to pass to the heirs of the devisee over who dies before such contingency, in the same manner as contingent remainders. They are held to be interests vested, though not in possession. *Gurnel* vs. *Wood*, 8 *Viner*, 112; *Ex.* 38; 2 *Eq. Cases abd.* 342, *Ex.* 21; *Willes*, 213; *Talbot*, 123; 2 *Fearne*, 532.

When, therefore, Mrs. Kean died intestate, her *right* or interest in the one-third part of the land devised to James B. Macomb, and which was limited over to her by way of executory devise, descended and passed, not to her eldest son, according to the rule in England, but equally to her two children; on the death of one of these children the entire contingent interest limited over to Mrs. Kean, passed to the surviving child, and on its death, its entire interest, which was the interest devised to its mother, passed, according to our act of assembly, (there being neither issue, nor brothers nor sisters of that child,) to its father, the lessor of the plaintiff, who thus acquired all the title, interest, and right which was given under the will by way of executory devise to his wife, by the testator, Thomas J. Macomb, in the one-third of the land; and when the contingency happened of James B. Macomb dying, without leaving a child in being, which subsequently did happen, Matthew Kean had a legal right to claim, as heir to his child, such share of that one-third part as his wife, if living, would have been entitled to.

The next question is, what interest or share was limited over to Mrs. Kean by way of executory devise in the one-third of the land given to J. B. Macomb, and what portion to the nephews and nieces of Mrs. Clayton, the sister of the testator? This depends upon the construction of the language used by the testator in his will. Was it his intention that they should take *per capita* or *per stirpes*?

There are some rules well established in construing wills, to which it may be useful to refer.

The intention of a testator is to be collected from the will itself, taking in aid the general rules of construction which have been settled by decision. In construing wills courts are bounded by the words it contains—of the words used they are to declare the plain meaning; if they should adopt a different course they would become the makers, instead of the expounders of the will. 2 *V. & Bea.* 271; 1 *Eden*, 43.

We may privately think that this or that was the intention of the

testator, but we are not at liberty by private opinion to establish a construction which is against the plain words of a will, or to give to words a meaning contrary to that which has been assigned to them by legal adjudication. 1 *Atky.* 273–4; 1 *Yeates*, 439.

When a testator uses technical words, or words which have received a settled legal sense, courts are bound to say *prima facie*, that he understood the meaning of them, and others are not to be substituted unless by express words, or from the context; or by an unavoidable and necessary construction it plainly appears that it was intended that the words should be construed or used otherwise, or unless it becomes necessary to do so in order to make sense of the will. 3 *Term*, 493; *Douglass*, 341; 1 *Yeates*, 343; 5 *Vezey*, 401–2; 2 *Ball & Beatt.* 204; 11 *Wendall*, 279, 293.

If words be used in a will which have received a settled construction, an established definite meaning by express adjudication, such construction should, for the sake of uniformity in the disposition of real estate, and for the security and repose of society, be adhered to by courts of justice, unless it violates the plain undoubted meaning of the instrument. 2 *Peere Wms.* 741; 3 *Cranch*, 184; 8 *Term*, 66; 5 *Mass.* 501; 4 *Kent's Com.* 539.

Lord Eldon, in the case of *Lady Lincoln* vs. *Pelham*, in 10 *Vezey*, says, with great propriety, "If there is a settled construction founded on cases decided, applying to the terms used, it is better to adhere to that settled construction, though I may entertain some doubt whether it is according to the intention, rather than upon some grounds on which I cannot rest on every view of the case, to come to a decision having a tendency to shake that which forms a rule of construction, and which may in practice have been acted on in many cases."

With this conclusion of Lord Eldon we accord, and if there be a well settled legal construction of the words and language which have been used by Thomas J. Macomb in his will, we hold it better to adopt that construction, although we may have some doubts, if such be in strict conformity with the intention and mind of the testator when he executed this will.

There are two rules of construction recognized and established by decision, either of which when applied to this will, leaves no doubt in our minds as to what should be the true legal determination of the question before us.

1. Whenever property is devised to children and grand children, or to brothers and sisters and nephews and nieces, to be equally divided between them, and the devisees are *individually named*, they take *per capita* and not *per stirpes*. When the devise is to them by name, they take in their own right, and not as the representatives of

another: the devise is made to them nominatim; they are personæ designatæ, and they claim not as representing their ancestor, although in the will as a descriptio personæ they may have been distinguished as his children, but in their own right, inasmuch as the testator has named them specially and personally, as those who have the legal personal and individual right to the benefit conferred by the will. In the case of *Blackler* vs. *Webb*, in 2 *Peere Wms.* 383, the attorney general in his argument, contended that the construction of the will must be the same as "if the testator had particularized each grandchild by name, as John, Thomas, &c. &c., when he said there could be *no question* but that the grandchildren must have taken per capita and not per stirpes." This principle was not denied by the opposing counsel, and Lord Chancellor King expressly admits its correctness, for he decreed in the case then before him, that the children and grand children "should each of them take *per capita*, as if all the grand children had been *named by their respective names.*" The Lord Chancellor recognizes the rule of law as one fixed and established, that the devisees take per capita and not per stirpes, if they be named by their respective names.

In *Phillips* vs. *Garth*, 3 *Brown*, 68-9, which was the case of a bequest of the residue to the next of kin, it appears that this principle was, by the counsel on both sides acceded to as a settled one, and about which there could be no controversy. Justice Buller, who sat in that case for the Lord Chancellor, in delivering his judgment says, " it *is agreed* that if he (the testator) had given it to his next of kin *by name*, they must have taken per capita." The applicability of this rule, which we consider to be one fully established, to the case before us, is apparent when we examine the will of Thomas J. Macomb. He devises all his real estate to his sister Elizabeth, to his brother James, and to his nephews and nieces, "Joshua Clayton, Elizabeth Clayton, Jennet Clayton, and Henry Clayton, children of my late sister Jennet Clayton, in the proportions and manner and under the restrictions following, that is to say, &c. &c." In this first clause of his will, in which he devises his real estate, he *specially names* all the devisees who are to partake of it; his nephews and nieces as well as his brother and sister. He then proceeds to fix the proportions they respectively shall take, and when he comes to dispose by way of executory devise, of the third devised to his brother, in the event of his dying without issue, and which third part is the subject of the present action, he devises it " to be equally divided between my sister Elizabeth and my *said* nephews and nieces, their heirs and assigns forever, as tenants in common." The devise is to his *said* nephews and nieces—that is, those whom he had previously designated and

whose names he had given, viz : Joshua, Elizabeth, Jennet and Henry, to be equally divided between them and his sister. By this specific reference to his nephews and nieces, whom he had previously named, they are as fully, individually and personally designated in reference to this third part, as if their names had been again repeated in connexion with this third, and the construction of this devise must be the same as if the names had been so repeated.

The devise in this will is not to the *issue* or *children* of the late *Mrs. Clayton*, but to four of her children, whose names are given ; and it may be remarked, as to the devise of the third now in controversy, the name of Mrs. Clayton does not appear in any way in connection with it. Mrs. Clayton might have left other children. Had such been the fact, could such other children have claimed a portion of this third part? Surely not. And yet, if the claim of these children of Mrs. Clayton is per stirpes, a representative one, all her children would be entitled. The stock could not be represented if one child was excluded.

2. The other rule to which we had reference as decisive of the questions in this case is this. The settled legal construction of the words *equally to be divided,* when used in a will is to cause an equal division of the property per capita and not per stirpes, whether the devisees be children and grandchildren, brothers or sisters and nephews and nieces, or strangers in blood to the testator. 1 *Brown,* 31 ; 3 *Ib.* 64 ; *Talbot,* 251.

In the case of *Butler* vs. *Stratton,* 3 *Brown,* 367, the testator bequeathed the sales of certain property to be *divided equally* between R. C. Stratton, John Stratton and the children of Mary Patterson. Mary Patterson had four children, and the question was, whether the legacy should be divided per stirpes or per capita, and it was ruled by Lord Thurlow, that the division should be per capita.

Lord Eldon, in the case we have before referred to, of *Lady Lincoln* vs. *Pelham,* in 10 *Vezey,* 176 says, when speaking of this rule, " it has been applied to many instances upon which doubts have been strongly raised—for instance, a gift to a brother and the children of a deceased brother, who without a will would take per stirpes : yet it has been held that though the law would have given it in moieties, that is not the effect of an express bequest ;" and after decreeing a distribution per capita, his lordship adds—whatever the actual intention may have been, the *legal effect* is a distribution per capita, and I cannot safely draw an inference from the other parts of the will, introducing distinctions tending to shake the settled doctrine.

In the case of *Lugar* vs. *Harman,* 1 *Cox,* 250, the testator bequeathed the residue of his estate to be equally divided amongst all and

every the child and children of his late cousin, Edward Lugar and his cousin Philip Fearis, and their lawful representatives, and Lord Kenyon, then master of the rolls, decreed one-fifth of the residue to Philip Fearis, and a fifth to each of the four children of Edward Lugar.

In *Northey* vs. *Strange*, 1 *P. Wms.* 341, there was a bequest by a freeman of London, of one moiety of the surplus of his personal estate to his son A., and the other moiety to his children and grand children, and it was ruled by Sir John Trevor, master of the rolls, that the children and grandchildren should take, per capita and not per stirpes; they all taking in their own right, and not by way of representation.

*Blackler* vs. *Webb,* reported in 2 *P. Wms.* 383, and to which we have heretofore referred, is a prominent case in relation to the rule we have stated. S. Bagwell having had several children, some of whom were dead and others living, by his will bequeathed the surplus of his personal estate equally to his son James, and to his son Peter's children, to his daughter Traverse, and to his daughter Webb's children, and to his daughter Mann. The question was, whether the children and grandchildren should take *per capita* or *per stirpes.* It was urged for the children that the distribution should be by stocks, as it was not probable that the testator should intend his own children to take no greater share of his estate than *each* of his grand-children, who were of tender years, and would require but a small expense for their maintenance and subsistence. But Lord Chancellor King decreed that the three children of the testator, James, Traverse, and Mann, and the children of Peter, who was dead, and the children of Mrs. Webb, being in all fourteen in number, should each take *per capita*, as if all the children had been named by their respective names. He held, that the grandchildren could not take according to the statute of distribution, or in allusion thereto, as the testator's daughter, Webb, was living, and her children could not therefore, represent her: and that it would be to go too much out of the will, and contrary to its words, to determine that the grand-children should take *per stirpes*, when the meaning of the testator might be according to his words, and that meaning a reasonable and sensible one.

By the terms of the will of Thomas J. Macomb, the third part of the real estate on the death of James B. Macomb without issue, is " to be *equally divided* between the testator's sister Elizabeth and his said nephews and nieces, their heirs and assigns forever, as tenants in common." The words used in this will, " *equally to be divided,*" have received a settled legal construction in courts of justice, as ap-

pears from the cases to which we have referred, and many others which might be cited; that is, an equal distribution *per capita* amongst the different legatees; and that too in cases in which it might well be doubted if such was the intention existing in the mind of the testator, as in the case of a father devising to a living son and the numerous offspring of a deceased child; and a brother devising to a sister and the children of a deceased sister. The first and natural impression would be in such cases that the testator meant, that his son and the children of his deceased son, or the sister and her nephews and nieces, should take in equal moieties, as the law would apportion it in cases of intestacy, and not that the son or sister should receive only a share *per capita*, an eighth or tenth part of the estate according to the number of children left by the deceased son or sister, and each grandchild or nephew take as much of the estate as the son or sister; and yet in these cases the law is settled beyond all doubt, that if by the will the fund is to be *equally divided*, the son or sister takes no larger share than one of the grandchildren, or nephews or nieces, unless there be something in the will plainly and explicitly controlling and over-ruling the established and legal sense of these words. A testator in using such technical words—words whose legal import is settled—is presumed in law to have understood and used them in their established legal sense, (unless from the will itself, or something to which it refers, the contrary clearly and satisfactorily appears,) and the legal operation of such words thus used must prevail. In adhering to an established rule, and giving to words that construction and sense which adjudged cases have assigned them, courts of justice pursue the safe course, and render secure the tenures and disposition of property. Where land-marks have been long fixed, it is for the common interest of society that they should be upheld and strengthened, rather than that their foundation should be weakened or in any manner impaired. The different provisions in this will, and the particular circumstances of this case, may be such as to raise doubt and conjecture as to the intention; but the inference arising from them is not such (as was said by Lord Eldon, in 10 *Vezey*, 176) as can overpower the settled construction of the words used by the testator. They are not of that plain, strong, conclusive, or overpowering character.

It is urged on the part of the plaintiff, that the provision in the will of Thomas J. Macomb, in relation to the legacies of £500 given to each of his sisters, by the will of Thomas Irons, and charged by the latter will on the land devised to Thomas J. Macomb, is of a character to control the legal operation of the language used by Thomas J. Macomb in his will. The argument is, that the legacies given to

the sisters by the grandfather, were equal in amount; that Thomas J. Macomb intended the devises in his will to his sister Elizabeth, and the children of his sister Jennet, to be in payment of those legacies; and therefore, that the court must infer or presume that the brother intended to give his sister Elizabeth, and the children of his sister Jennet equally of his estate, as the legacies of the sisters were equal, and they by his will, excluded from any claim for those legacies.

Such an inference, we think, cannot be drawn from this will. It is true the legacies to the sisters from their grandfather were equal, and charged on the land devised by him to Thomas J. Macomb, but we cannot presume that the latter designed the sisters or their children to take equal parts of his estate in satisfaction of those legacies, when the will plainly and expressly shows that he did not intend that they should partake of his estate *equally.* While *single,* Elizabeth, the sister, was to have one-half of the real estate, and the nephews and nieces only a fourth. To infer equality of interest under this will, because the legacies from Thomas Irons to the sisters were of the same amount, would be to violate the plain language and clear and undoubted design of Thomas J. Macomb. Such a construction would reduce the share of Elizabeth, even while single, from a half to a third of the estate; though it is manifest, beyond all question, that her brother intended that while single she should hold the one-half of his estate, and his nephews and nieces but a fourth. We, therefore, can perceive nothing in this provision of the will, taking in connection with it the will of Thomas Irons, that can, in our judgment, control the established construction and legal sense which judicial decisions have assigned to the words used by T. J. Macomb, in his will. It will be remarked, too, that the provision by T. J. Macomb as to these legacies, is not expressly in *satisfaction* or *payment,* but in *bar;* for the language he uses is, that the devises to his sister and nephews and nieces are to be in *lieu* of the principal and interest (IF ANY) of those legacies. There is no distinct admission that the whole or even any part is unpaid. His design was to *bar* any claim on his estate grounded on these legacies.

These nephews and nieces had no claim to the legacy given their mother by her grandfather. If unpaid, it belonged to their father, who is still living, and he might, after the death of Thomas J. Macomb, have recovered this legacy from his estate; and his children, the nephews and nieces of the testator, would not by that act have been debarred from enforcing their claim to the interest in the real estate of T. J. Macomb, devised them by his will, notwithstanding such recovery.

The precise disposition which it was designed to make of the third part of the land devised to James B. Macomb, in case he died without issue, is a matter of conjecture; of inference; and, indeed, of considerable doubt: for we find in one part of this will the testator providing, that in the event of James dying, and leaving no issue who shall be living at the time of Elizabeth's marriage, then her "*life estate*" is not to cease.   Why this provision securing to Elizabeth, after the death of James without issue, a continuance of a *life estate* in the moiety of the land, if he intended that on the death of James without issue, she should have a *fee* in the moiety?   It is manifest from the will, that the testator intended, if his brother died without issue, his nephews and nieces were to take the one-half of his real estate whether Elizabeth married or remained single.   But it is not equally clear that he intended if Elizabeth married, she should then be entitled to the one-half, or that these nephews and nieces should not have a right to more than the one-half.   In the absence, therefore, of a plain and explicit intention, the safe rule is to adopt the settled legal interpretation of the language the testator has employed. It may have been, and most probably was, the design of the testator to place his sister, and the children of his deceased sister, on an equality, if his brother died without issue.   But whatever his actual intention may have been, (and it is and must remain one of conjecture and at least of some doubt,) the legal effect of the language used by him in devising over the interest which had been given to James, as established by repeated decisions, is to prevent that equality, and to vest in his sister Elizabeth, and in each of his nephews and nieces, an equal share of that interest.   By the will that interest, which is a third part of the land, was to be *divided equally* between Elizabeth Macomb, (afterwards Mrs. Kean,) Joshua Clayton, Elizabeth Clayton, Jennet Clayton and Henry Clayton; that is, according to the established sense of these words, the share of each of these five devisees was to be equal.   It could not be "*divided equally*," as the will directs, unless each devisee received a share equal to that of each of the other devisees.   According to our judgment, we should unsettle the established doctrine of courts of justice, if we should undertake to draw from the other parts of this will, an *inference* (for it could be nothing more) which would annul or render inoperative the plain legal language in which the devise in question is couched.   We do not feel at liberty, as was said by the master of the rolls, in 8 *Vezey*, 42, by inference or argument from other parts of the will, to control the effect of a positive bequest.   But we hold it to be our duty to apply the rule in 6 *Term Rep.*, 352, "In construing a will to give effect to the devisor's intention, as far as we can consistently with

the rules of law, not conjecturing, but expounding his will from the words used. And where certain words have obtained a precise technical meaning, we ought not to give them a different meaning; for that would be, as Lord King and other Judges have said, removing land-marks."

Judgment. And now, to wit, this &c. this cause coming on to be heard by and before the court here, and the same being debated by counsel on both sides learned in the law, and this court having heard and considered the questions of law which were directed to be heard before this court, it is considered and adjudged by the court here, that upon the death of the said James B. Macomb, the said Matthew Kean took and became entitled only in and to an undivided fifth part or share of and in the said third part of the said lands and premises in the case stated mentioned, which said third part the said James B. Macomb took and became entitled to, under the said will of the said Thomas J. Macomb; and it is further ordered by the court here, that the record and proceedings in this cause be remanded to the Superior Court of this state in and for Kent county.

*J. A. Bayard*, for plaintiff.

*Frame*, for defendant.